# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HARVEY MIGUEL ROBINSON, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 08-3156 |
| JEFFREY BEARD, et al. | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER, S. J.                                                                               November 13, 2013

      Currently pending before the Court is a Partial Motion to Dismiss Plaintiff's Amended Complaint by Defendants Jeffrey A. Beard, David DiGuglielmo, Myron Stanishefski, Francis Beretsky, William Wilcox, and Bryan Toms (collectively, the "Commonwealth Defendants"). For the following reasons, the Motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND

      According to the facts set forth in the Amended Complaint, Plaintiff Harvey Miguel Rodriguez was an inmate within the "J Block" section of the State Correctional Institution ("SCI") at Graterford. (Am. Compl. ¶ 16.) J Block is a restricted housing unit ("RHU") where all inmates are subject to administrative segregation and, in most cases, require correctional officers to escort them when moving outside of their cells. (Id.)

      On July 3, 2006, Plaintiff was scheduled to attend the law library located within J Block at approximately 7:00 a.m. (Id. ¶ 17.) At that time, Defendant Bryan Toms, a correctional

officer, approached Plaintiff's cell door to escort Plaintiff to the library. (Id. ¶ 18.) Plaintiff told Toms that he required several more minutes to wash up and prepare himself. (Id.) When Toms returned to escort Plaintiff, but before he reached Plaintiff's cell, the cell door opened. (Id. ¶ 19.) Plaintiff stepped into the cell doorway and asked Toms why the door was opened, to which Toms replied, "to take you to the library, get dressed." (Id.) While Plaintiff was bending down to put on his shoes, Toms suddenly grabbed Plaintiff's upper body and pulled him out of the cell and into the tier area of J Block. (Id. ¶ 20.) At that time, Plaintiff and Toms were alone. (Id. ¶ 18.) Toms proceeded to hold Plaintiff by the throat with one hand while continually punching Plaintiff in the face and head. (Id. ¶ 21.) The punching continued for a period of time, during which Toms repeatedly stated, "go down" after every strike. (Id. ¶ 21.)

At that point, Defendants William Wilcox and Francis Beretsky came running down the B-Wing tier of J Block and immediately began punching and kicking Plaintiff while wrestling him to the ground, finally handcuffing Plaintiff behind his back. (Id. ¶ 22.) Toms and Beretsky then continued to kick and punch Plaintiff as he was handcuffed and lying on the ground. (Id. ¶ 23.) Plaintiff was then picked up by several correctional officers and confined in the shower area located in B-Wing. (Id. ¶ 24.)

After waiting in the shower for approximately thirty minutes, correctional officers escorted Plaintiff to the medical infirmary located in Graterford, where he was examined by two nurses and a physician, Dr. Felipe Arias. (Id. ¶ 26.) The medical staff completed a medical incident report and took pictures of almost all of Plaintiff's visible injuries. (Id.) During the examination, Plaintiff reported pain in his head, face, eye, ear, neck, shoulders, and back, as well as blurred vision and various abrasions. (Id. ¶ 27.)

At approximately 1:30 p.m. on the same day, Plaintiff received two DC-141 misconduct reports—one written by Defendant Joseph Frushon and one written by Defendant Toms—charging him with assault for purportedly threatening an employee and refusing a direct order based on the above described events. (Id. ¶ 28.) According to the reports, Plaintiff was being escorted to the law library by both Toms and Frushon and was able to "free his hand" from his cuffs in order to "swing[] his closed right fist repeatedly at Toms." (Id. ¶ 29.) The reports also accused Plaintiff of threatening Toms and refusing an order. (Id.)

From the time of the above-mentioned assault to the present, Plaintiff has submitted numerous medical sick call slips and has been scheduled from many "doctor line" call outs. (Id. ¶ 31.) In addition, he has experienced daily throbbing pain in his head and neck, as well as blurred vision. (Id.) He has reported and continues to report these conditions to the Graterford medical staff. (Id. ¶ 32.) Nonetheless, Graterford medical staff have denied most, if not all, of Plaintiff's requests for medical treatment, aside from occasionally providing Plaintiff with ibuprofen. (Id. ¶ 33.) Based on these denials, Plaintiff submitted an inmate grievance against Defendants, including Dr. Arias, in accordance with Graterford policy. (Id. ¶ 34.) Defendant Julie Knauer was assigned to investigate Plaintiff's grievances, but denied both his grievances and his requests for specialty medical treatment. Accordingly, Plaintiff filed a second level appeal to Superintendent David DiGuglielmo, who responded by upholding Defendant Knauer's decision. (Id. ¶ 36.)

During the first week of October 2006, Plaintiff began experiencing severe debilitating problems with his nervous system, causing his fingertips to go numb. (Id. ¶ 37.) By the end of October, the numbness, tingling, and pain spread to his palms, forearms, and biceps. (Id. ¶ 38.)

Plaintiff reported these problems to prison officials via sick call slips, medical visits, and written memoranda. (Id.) On November 1, 2006, Plaintiff separately sent Defendants DiGuglielmo and Knauer memoranda informing them of the aforementioned problems—which he believed were due to nerve damage as a result of his assault by Toms, Wilcox, and Beretsky—and requesting a CT scan and specialist treatment. (Id. ¶ 39.) No response was forthcoming other than the return of his memoranda with stamps marked "RECEIVED" by the medical department and by the Superintendent's office. (Id. ¶ 40.)

On November 20, 2006, Defendant Myron Stanishefski wrote to Plaintiff stating, "I have received your medical records. There is numerous documentation of your request for CAT scan and MRI. However, our medical exams and x-rays have been negative. Your request to be seen by a specialist and to receive an MRI or CAT scan is denied at this time." (Id. ¶ 41.) Nonetheless, Plaintiff continued to submit sick call slips describing his symptoms. (Id. ¶ 42.) Finally, on December 1, 2006, Dr. Arias informed Plaintiff that he was approving and sending Plaintiff for an MRI of his upper spinal column. (Id. ¶ 43.) Thereafter, on December 26, 2006, Plaintiff was taken to a local hospital and had an MRI done of his upper spinal column (neck). (Id. ¶ 45.) Ultimately, on December 30, 2006, Dr. Arias spoke with Plaintiff during a sick call visit, informed him that the MRI showed the Plaintiff had two ruptured disks and a fractured vertebra, and indicated that Plaintiff would be scheduled for a doctor line visit to discuss the MRI results. (Id. ¶ 46.) Dr. Arias further advised Plaintiff that he ordered additional tests to measure any nerve damage. (Id.)

Plaintiff continued to submit sick call slips and, during his sick call visits, he complained of a worsening nervous system condition. (Id. ¶ 47.) On February 20, 2007, Dr. Arias informed

4

Plaintiff that tests to measure nerve damage were approved.  (Id. ¶ 48.)  Subsequently, on March 29, 2007, Plaintiff was finally taken to a private physician, who performed nerve conduction studies.  (Id. ¶ 49.)

The following day, Plaintiff spoke directly with Defendant DiGuglielmo regarding his worsening nervous system problems, and DiGuglielmo assured Plaintiff that he would investigate his concerns.  (Id. ¶ 50.)  On April 10, 2007, Plaintiff again spoke directly to DiGuglielmo to express concerns over the status of his physical condition and to again request medical treatment.  (Id. ¶ 51.)  In addition, Plaintiff requested the aid of a plastic chair for resting on while in the shower and yard.  (Id.)  DiGuglielmo again agreed to look into it.  (Id.)

Plaintiff continued to submit sick call slips to request the results of his nerve conduction study tests.  (Id. ¶ 52.)  Eventually, Plaintiff was informed that he, in fact, had nerve damage and that he would be scheduled to speak to Dr. Arias.  (Id.)  When Plaintiff brought all of his requests to the attention of Dr. Arias during ensuing sick call visits, however, the doctor denied all requests for medical treatment beyond the provision of ibuprofen.  (Id. ¶ 54.)

Via letter dated July 30, 2007, Plaintiff wrote to Defendant Jeffrey Beard, Secretary of the Pennsylvania Department of Corrections, regarding the failure to address his worsening medical condition and to make Beard aware of the assault.  (Id. ¶ 55.)  Moreover, Plaintiff requested initial reviews on July 5, 2006, July 11, 2006, July 21, 2006, and July 31, 2006.  (Id. ¶ 57.)  He also sought both second level appeals and final reviews of the initial grievances/complaints.  (Id.)

Plaintiff commenced the current federal action in July 2008 against Jeffrey Beard, former secretary of Pennsylvania Department of Corrections; former Correctional Health Care Administrators Jule Knauer and Myron Stanishefski; former Superintendent David DiGuglielmo;

5

Prison Health Services employee Dr. Felipe Arias; and Corrections Officers Bryan Toms, Francis Beretsky, William Wilcox, and Joseph Frushon. The Court granted Defendants DiGuglielmo and Stanishefski's joint Motion to Dismiss on October 1, 2008. Subsequently, on July 22, 2009, the Court granted Defendant Beard's and Defendant Arias's Motions to Dismiss. Following an extended discovery period, Plaintiff requested and was granted leave to file an Amended Complaint. Plaintiff filed his current Amended Complaint on September 11, 2013, setting forth the following causes of action: (1) violation of the Eighth and Fourteenth Amendments of the United States Constitution under 42 U.S.C. § 1983; (2) assault and battery; (3) intentional infliction of emotional distress; (4) negligent infliction of emotional distress; and (5) negligence. On October 7, 2013, the Commonwealth Defendants moved for partial dismissal of this Amended Complaint pursuant to both Federal Rule of Civil Procedure 12(b)(1) and Federal Rule of Civil Procedure 12(b)(6). Plaintiff filed a Response on October 31, 2013. The Court now turns to consideration of the present Motion.

## II. STANDARDS OF REVIEW

### A. Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the power of a federal court to hear a claim or a case. Gould Elecs., Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000). When presented with a Rule 12(b)(1) motion, the plaintiff "will have the burden of proof that jurisdiction does in fact exist." Petruska v. Gannon Univ., 462 F.3d 294, 302 n.3 (3d Cir. 2006). There are two types of Rule 12(b)(1) motions. A "facial" attack assumes that the allegations of the complaint are true, but contends that the pleadings fail to present an action within the court's jurisdiction. Mortenson v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884,

891 (3d Cir. 1977). If the complaint is deficient as pled, the court should grant leave to amend before dismissing it with prejudice. Shane v. Fauver, 213 F.3d 113, 116–17 (3d Cir. 2000). A "factual" attack, on the other hand, argues that, while the pleadings themselves facially establish jurisdiction, one or more of the factual allegations is untrue thereby causing the case to fall outside the court's jurisdiction. Mortenson, 549 F.2d at 891. In such a case, "no presumptive truthfulness attaches to plaintiff's allegations" and the court must evaluate the merits of the disputed allegations because "the trial court's . . . very power to hear the case" is at issue. Id.

A motion to dismiss pursuant to the Eleventh Amendment—as in the present case— is properly reviewed under Federal Rule of Civil Procedure 12(b)(1). Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 693 n.2 (3d Cir. 1996). Such a motion is a "facial" challenge. See, e.g., Scott v. Commonwealth Dep't of Public Welfare, No. Civ.A.02-3799, 2003 WL 22133799, at *2 (E.D. Pa. Aug. 28, 2003); Nelson v. Commonwealth of Pa. Dep't of Public Welfare, 244 F. Supp. 2d 382, 386 (E.D. Pa. 2002). Accordingly, when presented with an Eleventh Amendment challenge, the court "must accept the complaint's allegations as true" and draw all reasonable inferences in favor of the plaintiffs. Scott, 2003 WL 22133799 at *2 (quoting Turicentro, S.A. v. Am. Airlines Inc., 303 F.3d 293, 300 n.4 (3d Cir. 2002)).

B.    **Rule 12(b)(6)**

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P.12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a

7

formulaic recitation of the elements of a cause of action will not do." Id. at 555. Following these basic dictates, the Supreme Court, in Ashcroft v. Iqbal, 556 U.S. 662 (2009), subsequently defined a two-pronged approach to a court's review of a motion to dismiss. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Thus, although "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678–79.

Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679. "Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.; see also Phillips v. Cnty. of Allegheny, 515 F.3d 224, 232–34 (3d Cir. 2008) (holding that: (1) factual allegations of complaint must provide notice to defendant; (2) complaint must allege facts suggestive of the proscribed conduct; and (3) the complaint's "'factual allegations must be enough to raise a right to relief above the speculative level.'" (quoting Twombly, 550 U.S. at 555)).

Notwithstanding these new dictates, the basic tenets of the Rule 12(b)(6) standard of review have remained static. Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008). The general rules of pleading still require only a

8

short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. Phillips, 515 F.3d at 233. Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III. DISCUSSION

The Commonwealth Defendants[1] move to partially dismiss the Amended Complaint against them on the following grounds: (1) the Commonwealth Defendants, in their official capacities, are not "persons" subject to liability under § 1983 and, thus, any such suit against them is barred by the Eleventh Amendment; (2) the Eleventh Amendment bars Plaintiff's claims against the Commonwealth Defendants in their individual capacities;[2] (3) sovereign immunity bars Plaintiff's claims against the Commonwealth Defendants under Pennsylvania common law. The Court addresses each argument individually.[3]

---

[1] Defendants Arias, Knauer, and Frushon are not parties to the present Motion. Notably, however, the Court granted Defendant Arias's Motion to Dismiss with prejudice on July 22, 2009. Moreover, Defendants Knauer and Frushon were never served with either the original Complaint or the Amended Complaint, meaning they are not proper parties to the action.

[2] It remains unclear whether the Commonwealth Defendants are seeking dismissal of the § 1983 claims to the extent they are asserted against Defendants Toms, Wilcox, and Beretsky in their individual capacities. In fact, their proposed order seems to concede that these claims remain viable. Plaintiff, however, sets forth a response to such an argument in his opposition brief as if it were raised by Defendants. For purposes of clarity and comprehensiveness, the Court will briefly address this contention.

[3] Defendants also argue that: (1) to the extent Plaintiff is alleging an Eighth Amendment deliberate indifference claim against Commonwealth Defendants, it must fail; and (2) Plaintiff's substantive due process claim must fail. Plaintiff's Response in Opposition, however, explicitly
9

### A. Whether the Commonwealth Defendants, in their Official Capacities, Are Subject to Liability Under § 1983

The Commonwealth Defendants first argue that to the extent Plaintiff sues them in their official capacities, the Eighth and Fourteenth Amendment claims must be dismissed under Federal Rule of Civil Procedure 12(b)(1). Specifically, they note that a plaintiff may only bring a section 1983 action if he alleges that a "person" acting under color of state law deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. They further reason that "[t]he Commonwealth defendants are Commonwealth employees . . . . Because of their status, Commonwealth defendants are not 'person[s]' subject to liability for damages under § 1983 in their official capacities." (Defs.' Mem. Supp. Mot. Dismiss 5.)

Defendants' argument rings true. The United States Supreme Court has recognized the difference between official-capacity and personal capacity lawsuits as follows:

> [O]fficial-capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" . . . A suit against a state official in her official capacity therefore should be treated as a suit against the State . . . . Indeed, when an official sued in this capacity in federal court dies or leaves office, her successor automatically assumes her role in the litigation . . . . Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, "the entity's 'policy or custom' must have played a part in the violation of federal law." . . . For the same reason, the only immunities available to

---

states that "[i]n adherence to the prior orders of this Court, Plaintiff is not attempting to reassert or allege a new Eighth Amendment indifference claim. Likewise, Plaintiff is not attempting to assert a substantive due process claim under the Fourteenth Amendment." (Pl.'s Resp. Opp'n Mot. Dismiss 2 n.2.)

The Court presumes that this concession applies equally to the claims against Defendants DiGuglielmo, Stanishefski, and Beard since the Court has already dismissed Plaintiff's claims against them with prejudice. Indeed, Plaintiff's proposed order suggests that Defendants' Motion as to these individuals should be granted. As the Amended Complaint cannot reassert the dismissed claims, these Defendants are deemed to no longer be part of this action.

10

> the defendant in an official-capacity action are those that the governmental entity possesses.
>
> Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law. Thus, "[o]n the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." . . . While the plaintiff in a personal-capacity suit need not establish a connection to governmental "policy or custom," officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law.

Hafer v. Melo, 502 U.S. 21, 25 (1991) (emphasis in original) (citations omitted). Thus, as a general rule, an official-capacity suit is merely another way of pleading an action against an entity of which an officer is an agent. Kentucky v. Graham, 473 U.S. 159, 165 (1985). Such a suit is properly treated as a suit against the governmental entity itself. Id. at 166.

To that end, the United States Supreme Court has expressly held that the phrase "person" in 42 U.S.C. § 1983 was not meant to include state officials in their official capacities. Will v. Mich. Dep't of State Police, 491 U.S. 58, 70–71 (1989). The Court noted that it is well-established that, pursuant to the Eleventh Amendment,[4] "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." Edelman v. Jordan, 415 U.S. 651, 662–663 (1974). "[F]or over a century now, [the Supreme Court has] made clear that the Constitution does not provide for federal jurisdiction over suits against nonconsenting States." Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73 (2000) (citing

---

[4] "The Eleventh Amendment renders the States immune from 'any suit in law or equity, commenced or prosecuted . . . by Citizens of another State, or by Citizens or Subjects of any Foreign State.'" Tennessee v. Lane, 541 U.S. 509, 517 (2004). Although the Eleventh Amendment expressly refers to suits by citizens of "another State," the Supreme Court has repeatedly held that this immunity "applies to unconsented suits brought by a State's own citizens." Id.

College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666 (1999); Seminole Tribe of Fla. v. Florida, 517 U.S. 44 (1996)). Thus, consistent with the notion that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," the Supreme Court has held that the Eleventh Amendment also precludes suits against state officials in their official capacities. Will, 491 U.S. at 70–71.

In an effort to avoid this Eleventh Amendment bar, Plaintiff invokes an exception set forth by the Supreme Court in Ex parte Young, 209 U.S. 123 (1908). In Young and its progeny, the Supreme Court held that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" Will, 491 U.S. at 71 n.10 (citing Graham, 473 U.S. at 167, n.14; Young, 209 U.S. at 159–60). Therefore, a suit for prospective equitable relief challenging the constitutionality of a state official's action does not constitute a lawsuit against the State and, thus, does not violate the Eleventh Amendment. Doe v. Div. of Youth & Family Servs., 148 F. Supp. 2d 462, 484 (D.N.J. 2001) (citing Death Row Prisoners of Pa. v. Ridge, 948 F. Supp. 1258, 1265 (E.D. Pa. 1996) (quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984))). This doctrine ensures that state officials do not use the Eleventh Amendment as a method for "avoiding compliance with federal law." P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993).

This exception to the Eleventh Amendment, however, is a very narrow one: "It applies only to prospective relief, does not permit judgments against state officers declaring that they violated federal law in the past, . . . and has no application in suits against the States and their agencies which are barred regardless of the relief sought." Id. The Supreme Court has reasoned

that:

> Both prospective and retrospective relief implicate Eleventh Amendment concerns, but the availability of prospective relief of the sort awarded in Ex parte Young gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law . . . . But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.

Green v. Mansour, 474 U.S. 64, 68–69 (1985); see also Christ the King Manor, Inc. v. Sec'y U.S. Dept. of Health & Human Servs., 730 F.3d 291, 318 (3d Cir. 2013) ("Plaintiffs can therefore bring suit against state officers, but their remedies are limited to those that are 'designed to end a continuing violation of federal law.' . . . Plaintiffs may not be awarded damages or other forms of retroactive relief . . . . That bar on retroactive relief includes forms of equitable relief that are functionally equivalent to damage awards.").

In the present case, the "Prayer for Relief" in the Amended Complaint seeks injunctive relief in the form of "[a] declaration that the acts and omissions described herein violated plaintiff's rights under the Constitution and laws of the United States." (Am. Compl. 17.) That requested injunctive relief is retrospective, not prospective, in nature. Defendants' actions of excessive force for which Plaintiff seeks relief are completed and there is no continuing violation of constitutional rights occurring. Under well-established Supreme Court precedent, such requested relief is insufficient to overcome the Eleventh Amendment's prohibition on lawsuits against state officials in their official capacity. As Plaintiff's official-capacity suits against the Commonwealth Defendants are nothing more than suits against the Commonwealth itself, the Court deems them barred by the Eleventh Amendment and dismisses them pursuant to Rule 12(b)(1).

13

B.  **Whether the Eleventh Amendment Bars Suits Against the Commonwealth Defendants in their Individual Capacities**

In Hafer v. Melo, 502 U.S. 21 (1991), the Supreme Court held that the Eleventh Amendment does not bar suits brought against state officials in their individual capacities, even if the actions which are the subject of the suit were part of their official duties. Id. at 30. Specifically, it held that "state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983. The Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts." Id. at 31; see also Slinger v. N.J., 366 F. App'x 357, 360–61 (3d Cir. 2010).

Given these principles, to the extent Defendants seek dismissal of the individual-capacity § 1983 claims against the Commonwealth Defendants pursuant to the Eleventh Amendment, their argument is unfounded. Plaintiff's § 1983 claims against Defendants Toms, Wilcox, and Beretsky shall not be dismissed.

C.  **Whether Sovereign Immunity Bars Plaintiff's Claims Under Pennsylvania Common Law**

Finally, the Commonwealth Defendants move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss Plaintiff's state law claims of assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. Specifically, they assert that all of the Commonwealth Defendants are "Commonwealth parties" as defined by Pennsylvania statute.[5] As the Commonwealth's presumed sovereign immunity has not been waived in assault, battery, and negligence claims against Department of Corrections

---

[5] A "Commonwealth party" is defined as "[a] Commonwealth agency and any employee thereof, but only with respect to an act within the scope of his office or employment." 42 Pa. Cons. Stat. § 8501.

14

personnel, Defendants conclude that the common law tort claims must be dismissed.

The Court disagrees. Pennsylvania law provides that Commonwealth employees enjoy immunity from most state law claims.[6] Kintzel v. Kleeman, No. Civ.A.13-163, 2013 WL 4498969, at *3 (M.D. Pa. Aug. 9, 2013). Unlike Eleventh Amendment immunity, sovereign immunity "applies to Commonwealth employees in both their official and individual capacities, so long as the employees are 'acting within the scope of their duties.'" Larsen v. State Emps.' Ret. Sys., 553 F. Supp. 2d 403, 420 (M.D. Pa. 2008) (citing Maute v. Frank, 657 A.2d 985, 986 (Pa. Super. Ct. 1995)). Sovereign immunity shields Commonwealth employees from liability when their actions: (1) cannot fit into one of the nine statutory sovereign immunity exceptions; (2) are not negligent; and (3) occur within the scope of their employment. Kintzel, 2013 WL 4498969, at *3. The United States Court of Appeals for the Third Circuit has indicated that, under Pennsylvania law, "'conduct is within the scope of employment where: (a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits [and] (c) it is actuated, at least in part, by purpose to serve the master . . . .'"

---

[6] Sovereign immunity is codified at 1 Pa.C.S. § 2310, as follows:

Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial procedure) or 62 (relating to procurement) unless otherwise specifically authorized by statute.

1 Pa. Cons. Stat. § 2310

15

Brumfield v. Sanders, 232 F.3d 376, 380 (3d Cir. 2000) (quoting Restatement (Second) of Agency § 236 (1958)).

In the present case, the Commonwealth Defendants' Motion to Dismiss fails at the third step of the sovereign immunity test—whether the assault of Plaintiff by Defendants Toms, Beretsky, and Wilcox on July 3, 2006 was within the scope of their employment as state correctional officers. Although these Defendants were arguably working within the authorized time and space limits of their employment when the alleged beating occurred, Plaintiff avers that he did not engage in any conduct to warrant the use of force and that the beating was done in retaliation for his criminal convictions, because of grievances/complaints he submitted against Defendants and their co-workers, and/or in abuse of their authority as correctional officers. (Am. Compl. ¶¶ 25, 77.) Assuming such allegations to be true, the Court cannot find that such conduct is of the kind the Defendants were employed to perform or that it was taken to serve the purposes of the Department of Corrections. Given these outstanding factual issues, the Court declines, at this time, to cloak the Defendants with the protection of sovereign immunity.

## IV. CONCLUSION

In sum, the Court grants the Commonwealth Defendants' Motion in part and denies it in part. First, although the Amended Complaint reasserts claims against Defendants Jeffrey A. Beard, David DiGuglielmo, and Myron Stanishefski, the Court finds—and Plaintiff appears to concede—that these Defendants have already been dismissed from this action with prejudice and that any reasserted claims against them are barred. With respect to Plaintiff's Eighth Amendment excessive force claim against Defendants Toms, Wilcox, and Beretsky in their official capacities, the claims are barred by the Eleventh Amendment and, thus, must be

dismissed in their entirety under Rule 12(b)(1). With respect to Plaintiff's Eighth Amendment excessive force claims against Defendants Toms, Wilcox, and Beretsky in their individual capacities, however, the claims are valid and shall not be dismissed. Finally, the Court declines to find that Defendants Toms, Wilcox, and Beretsky are protected by sovereign immunity against the remaining state law claims, as Plaintiff has plausibly alleged that their actions were performed outside the scope of their employment.

An appropriate Order follows.